In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2587

TOM BEU XIONG,

*Plaintiff-Appellant,*

*v.*

JENNIFER A. FISCHER, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cv-00418-jdp — **James D. Peterson**, *Judge.*

ARGUED DECEMBER 8, 2014 — DECIDED MAY 18, 2015

Before BAUER and HAMILTON, *Circuit Judges,* and ELLIS,
*District Judge.*[*]

BAUER, *Circuit Judge.* Plaintiff-appellant, Tom Beu Xiong
("Xiong"), is a former employee of defendant-appellee, Dane
County Department of Human Services ("the Department"),
and former member of the defendant-appellee, Dane County

[*] The Honorable Sara L. Ellis, of the United States District Court for the
Northern District of Illinois, sitting by designation.

Professional Social Workers, Local 2634, AFSCME, AFL-CIO ("the Union"). Xiong appeals the dismissal of his claims of breach of duty of fair representation against the Union and breach of collective bargaining agreement against the Department, as well as various constitutional claims against Xiong's supervisor, Jennifer Fischer ("Fischer"), the Union, and the Department (collectively "the defendants"). We affirm.

## I. BACKGROUND

This case arises out of the defendants' behavior toward Xiong before and after he was terminated from his job as a senior clinical social worker. Xiong began working for the Department as a social worker in 1990, serving primarily the elderly and physically disabled individuals. As a member of the Union, he was covered by a collective bargaining agreement ("CBA") that provided, among other things, that the Union would assist and represent employees throughout the pre-disciplinary, grievance, and termination processes.

In May 2012, Xiong's supervisor, Fischer, learned that Xiong had committed significant work rule violations. Notably, Fischer discovered that Xiong had forged her signature on a number of documents, called in sick to work after Fischer had explicitly denied his requests to be excused, failed to meet deadlines or complete paperwork related to an upcoming audit, attended divorce proceedings during work time without authorization, and moved a client from one family home to another without completing the required paperwork. As a result, Fischer sent a letter to Xiong on May 22, 2012, indicating that she had concerns related to his employment and requesting his presence at a pre-disciplinary meeting scheduled for

May 24, 2012. The letter identified six areas of concern and nine work rules that Fischer believed Xiong had broken. Fischer also informed Xiong that, due to the nature of the concerns and potential violations, he would have an opportunity to respond to the allegations against him and to have a representative from the Union present at the meeting. Fischer sent copies of the letter to her supervisors, including Theresa Sanders ("Sanders"), Fran Genter ("Genter"), and the Director of the Department, Lynn Green ("Green"), as well as the President of the Union, Kate Gravel ("Gravel").

Having taken unauthorized leave on May 22 and 23, Xiong did not receive Fischer's letter until he arrived at work on May 24. However, he discussed the letter's accusations with Gravel by phone on May 23 and informed her that he wished to have a Union representative present at the pre-disciplinary meeting. On May 24, 2012, Xiong attended the pre-disciplinary meeting accompanied by his union steward, Sue DeBuhr ("DeBuhr"), at which Fischer and Sanders laid out their concerns with Xiong's behavior. When given the opportunity to respond, Xiong admitted to each of the allegations against him. Fischer also discussed Xiong's recent failure to pass the 2012 Long Term Care Functional Screen Test, passage of which was required to maintain Xiong's certification as a social worker. Xiong had taken the test in March 2012 and received a failing score of 67 percent. Green had contacted the Wisconsin Department of Health Services ("DHS") after learning of Xiong's failing score and asked DHS to permit Xiong to complete a plan of correction. DHS denied Green's request on May 10, 2012, citing a new policy established by the state that prohibited individuals who scored less than 70 percent on the

functional screen test from taking remedial measures. Consequently, by the time of his pre-disciplinary meeting on May 24, Xiong was no longer certified to perform a substantial part of his work with the Department.

A week after the meeting, Xiong received a letter, signed by Fischer, informing him that he had been terminated. It is undisputed that Fischer did not have the authority under the Dane County Civil Service Ordinance to make the decision to fire Xiong. Rather, this power is held by those who are designated as "appointing authorities" under the ordinance; in this case, that person was Green. Fischer testified at her deposition that she personally consulted with three levels of management prior to delivering Xiong's termination notice: her direct supervisor, Sanders; Sanders' supervisor, Genter; and the Employee Relations department. She also testified that she gave Genter the letter and received his approval before the termination meeting with Xiong. As we will discuss below, it is not clear at which point Green authorized the decision to terminate Xiong, but Green was copied on the letter of termination and Xiong admits that Genter told the Union that the decision to terminate Xiong was made "far above" him.

Under the terms of the CBA between the Union and Dane County ("the County"), employees may only be terminated for good cause. An employee wishing to challenge adverse employment actions may do so by either following the grievance process outlined in the CBA or using the appeals procedure established by the Dane County Civil Service Ordinance. Xiong chose to challenge his termination under the CBA, which sets out a four-step process. At Step 1, the employee and the Union take up the grievance orally with the employee's first

line of supervision. If the parties are unable to come to a mutually satisfactory decision, the employee or the Union moves on to the second step of the process. At Step 2, the employee or the Union presents the grievance in writing to the department head—in this case, Green. If the matter is not resolved there, the employee or the Union may advance the grievance to Step 3, which involves presenting the grievance to the County Executive or designee. Finally, if the grievance is not settled at the third step, the Union may take the matter to arbitration. In order for the Union to pursue this fourth step, however, members of the Union's bargaining unit must vote to do so.

After bypassing the first two steps of the grievance procedure, the Union began Xiong's appeal at Step 3 of the process. At a hearing before Travis Myren, the Dane County Chief Administrative Officer and Director of Administration, the Union presented arguments in Xiong's defense and requested that he be suspended, rather than terminated. Myren, citing concerns that Xiong was no longer certified to perform his job duties and finding that his work rule violations represented a "gross violation of trust," denied the appeal. Faced with the decision of whether to pursue arbitration, the Union board met with Xiong and allowed him to present his side of the grievance once more. Ultimately, the Union board voted unanimously not to arbitrate Xiong's case. After rejecting a severance and benefits offer by the County in exchange for dropping the grievance, Xiong filed the underlying action against the Union, the Department, and Fischer.

At the close of discovery, the parties filed cross motions for summary judgment. As a preliminary matter, the district court

noted that Xiong did not follow local court rules. Pursuant to these rules, if a nonmoving party disputes a fact, the non-moving party must state its own version of the fact and support that version with evidence. *See* Rule II(D), Procedure to be Followed on Motions for Summary Judgment (W.D. Wis.). Although Xiong listed the defendants' facts that he agreed with, he did not respond to a number of others in accordance with this local rule. The court found that Xiong's non-response to certain proposed findings of fact submitted by the defendants failed to raise a genuine dispute and accepted as undisputed all of the defendants' proposed facts. The district court granted the defendants' motions for summary judgment. This appeal followed.

## II. ANALYSIS

Xiong contends that the district court erroneously granted summary judgment in favor of Fischer, the Department, and the Union. We review this grant *de novo*, viewing all evidence in the light most favorable to the nonmoving party; summary judgment will be upheld if the record reveals "no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986).

### A. Breach of the Duty of Fair Representation

Xiong alleges that the Union failed to fulfill its duty to fairly represent him throughout the grievance process when it bypassed steps 1 and 2 of the grievance process and refused to take his grievance to arbitration. It is well-established that labor unions owe a duty of fair representation to their members. *See Clark v. Hein-Warner Corp.,* 99 N.W.2d 132, 136–37

(Wis. 1959) (holding that unions have an implied fiduciary duty of fair representation); *Mahnke v. Wis. Emp't Relations Comm.*, 225 N.W.2d 617 (Wis. 1975) (adopting federal precedent in analyzing claims for breach of the duty of fair representation, as articulated in *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)); *Vaca,* 386 U.S. at 182 (explaining that the duty of fair representation serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress"). However, unions are afforded considerable latitude and a wide range of reasonableness in deciding whether to pursue a grievance through arbitration. *Mahnke,* 225 N.W.2d at 622 (citing *Humphrey v. Moore*, 375 U.S. 355 (1964)). Accordingly, a union's decision to refuse to process or pursue an employee's grievance any further breaches its duty of fair representation "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith." *Mahnke*, 225 N.W.2d at 622 (quoting *Vaca,* 386 U.S. at 190).

Xiong's claim that the Union's decision to bypass steps 1 and 2 and proceed directly to Step 3 was arbitrary is unpersuasive. Whether the Union acted arbitrarily "requires inquiry into the objective adequacy of union action." *Serv. Emps. Int'l Union Local No. 150 v. Wis. Emp't Relations Comm.*, 791 N.W.2d 662, 668 (Wis. Ct. App. 2010) (citing *Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers*, 30 F.3d 60, 63 (7th Cir. 1994)). *See also Serv. Emps. Int'l Union,* 791 N.W.2d at 669 (citing *Airline Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) for the proposition that a "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a

'wide range of reasonableness' as to be irrational"). The record indicates that the Union often proceeded directly to Step 3 in cases where the first two levels of review had already been involved in the disciplinary decision. Here, the Union determined that the best course of action was to bypass steps 1 and 2 because the individuals who would process Xiong's grievance at each of those respective stages, Fischer and Green, had already made a final decision regarding Xiong's termination and were unlikely to change course on appeal. This conclusion was informed by the Union's first-hand knowledge of the circumstances surrounding Xiong's termination: not only was the Union present during Fischer's pre-disciplinary meeting with Xiong—where Xiong admitted to the allegations against him—but the Union was told by Genter, one of Fischer's superiors, that the matter was out of his hands and the decision to terminate Xiong had been made "far above" him. Based on this information, it was reasonable for the Union to believe that pursuing steps 1 and 2 would be unproductive, and to appeal the matter directly to the County's Director of Administration.

Xiong's second argument—that the union's decision not to advance his grievance to arbitration (Step 4) was arbitrary—also fails. A union's conduct is arbitrary if it ignores a meritorious grievance or processes a grievance in a perfunctory manner, but an employee does not have an absolute right to advance a grievance to arbitration. *Vaca*, 386 U.S. at 191; *Coleman v. Outboard Marine Co.,* 285 N.W.2d 631, 635 (Wis. 1979). Here, the Union was in regular contact with Xiong and represented him at every turn of the termination process. Not only was the Union well-aware of the charges against Xiong, the Union also knew that the County had denied Xiong's

Step 3 grievance because his conduct amounted to a "gross violation of trust" and needed to be "treated with the highest degree of severity." Moreover, the Union discovered that Xiong had not passed his functional screen test and that, according to state policy, Xiong would not be allowed to take any remedial measures in order to become certified to perform his work with the Department. Although the Union advocated for a transfer so that Xiong could continue to work with the Department in a capacity that did not require functional screen test certification, the Department denied this request, explaining that Xiong's conduct was too serious to excuse and he would have been terminated regardless of his test score. Regardless, the Union still afforded Xiong a final opportunity to present his case before the board before deciding not to pursue arbitration, as well as negotiated a favorable separation agreement that would help mitigate the loss of his health insurance. Taken as a whole, the record shows that the Union's refusal to arbitrate Xiong's grievance was reasonable, and Xiong has failed to adduce any evidence from which a jury could conclude the Union disregarded his rights or failed to adequately represent him.

## B. Breach of the Dane County Civil Service Ordinance

Xiong alleges that the manner in which he was terminated violated the Dane County Civil Service Ordinance. Section 18.13 of this ordinance provides that "any appointing authority may … discharge an employee." Section 18.04(1) defines an "appointing authority" as "any county board, commission, committee, institution, agency, elected official, or department head that has been granted authority to hire employees in the county civil service." It is undisputed by the parties that Green,

not Fischer, was the proper "appointing authority" with the power to terminate Xiong. The parties also agree that Fischer, in consultation with the Employee Relations department and her supervisors, Sanders and Genter, composed and signed the letter informing Xiong that he had been terminated. Xiong contends that, in doing so, Fischer exceeded her authority in violation of the ordinance.

Xiong fails to adduce sufficient evidence to support this claim. Xiong focuses much of his argument on whether "Fischer [has] the authority to signed [sic] a termination letter after consulting with 3 level [sic] of management above her, but not the appointing authority, who is Green." However, the fact that Fischer signed the termination notice is not sufficient to sustain a reasonable inference that Xiong's termination violated the terms of the Dane County Civil Service Ordinance. The ordinance states that whenever an appointing authority "decides to take action" against an employee, written notice shall either be mailed to the employee's last known address or given to the employee within two business days of the action being taken. As far as what is required of the written notice, the ordinance only states that the notice shall explain the employee's right to appeal and describe the reasons for the action. Critically, the ordinance does not require the appointing authority to sign, write, or personally deliver the notice, nor does it prevent someone other than the appointing authority from doing so. Accordingly, Xiong has no claim based on the fact that Fischer relayed the final decision to him in the termination letter.

The real question is whether or not Green authorized the decision to terminate Xiong. Once again, Xiong fails to identify

sufficient facts from the record to support the reasonable inference that his termination violated the terms of the Dane County Civil Service Ordinance. Xiong contends that it is "undisputed that [Fischer] made the decision" because she used the words "I" and "me" throughout the termination letter. Specifically, Xiong takes issue with a sentence that reads, "I have determined that you have violated the following work rules." But this evidence does not bear on whether Fischer made the final decision to terminate Xiong. Fischer never states in the letter that *she* decided to terminate Xiong; she writes only that "[b]ecause you do not have the necessary qualifications … and because you have violated the above work rules, you are being terminated effective Friday June 1, 2012." This language does not imply that Fischer made the decision to terminate Xiong; rather, it shows beyond a reasonable dispute that Fischer's letter merely relayed the final determination.

Xiong also points to the fact that Fischer never personally consulted with Green prior to writing the termination letter. While this detail is not insignificant, it is the role of this court to examine the record as a whole and determine if it contains sufficient evidence—as opposed to evidence that is merely colorable—to raise a genuine issue for trial. *See Anderson*, 477 U.S. at 249–50 (citations omitted) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable … summary judgment may be granted."). It is undisputed that Fischer consulted with three levels of upper management before delivering the notice of termination to Xiong. It is also clear that Green was copied on both the May 22 letter, which described the serious allegations

against Xiong, and the June 1 termination notice. Finally, and perhaps most importantly, Xiong admits that Genter, who works directly below Green, told the Union that the decision to terminate Xiong's employment was "out of his hands" and was made "far above" him, suggesting that an individual higher than Fischer, Sanders, and Genter made the decision. Based on this record evidence as a whole, even when viewed in the light most favorable to the plaintiff, Xiong cannot establish a genuine issue of a material fact with respect to his claim that his termination violated the terms of the Dane County Civil Service Ordinance.

### C.  Due Process Violations

We now turn to Xiong's constitutional claims against the Union, Fischer, and the Department, which he brings pursuant to 42 U.S.C. § 1983. Suits under § 1983 are meant to deter state actors from using the "color of state law" to deprive individuals of rights guaranteed by the Constitution. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). Thus, in order to bring a claim under this section, the plaintiff must show two elements: (1) the party against whom the claim is brought qualifies as a "person acting under the color of state law"; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1986)).

Xiong alleges that the Union violated his Fourteenth Amendment right to due process when it prohibited him from arbitrating his grievance. As a general matter, "unions are not

state actors; they are private actors." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). Nevertheless, conduct of private actors may, in some cases, amount to "state action" where the deprivation is "caused by the exercise of some right or privilege created by the state … or by a person for whom the state is responsible" and "the party charged with the deprivation … may fairly be said to be a state actor." *Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 937 (1982). "A private defendant acts 'under color of' state law for purposes of Section 1983 when [it] is a 'willful participant in joint action with the State or its agents.'" *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 281 (7th Cir. 1986) (quoting *Dennis v. Sparks,* 499 U.S. 24, 27 (1980)).

To succeed against the Union, Xiong must allege facts that show a sufficient nexus between the state and the Union so that the Union's alleged infringement of Xiong's federal rights is "fairly attributable to the state." *Lugar,* 457 U.S. at 937. *See also Hallinan*, 570 F.3d at 815–16 (describing the numerous situations in which the Court has found that private conduct took on the color of state law); *Jackson v. Metro. Edison Co.,* 419 U.S. 345 (1974). In his complaint, Xiong essentially alleges that the Union and the County wanted to maintain their collective bargaining relationship without incurring additional costs, so they conspired to limit the ability of County employees to invoke arbitration. However, even putting aside the fact that the CBA grievance procedure was not mandatory (Xiong could have elected to pursue a civil service appeal instead), this argument is not persuasive. It is well established that "a bare allegation of a conspiracy between private and state entities is insufficient to bring the private entity within the scope of

§ 1983." *Messman v. Helmke*, 133 F.3d 1042, 1045 (7th Cir. 1998). Furthermore, although the CBA creates a grievance mechanism in which the County and the Union agree to participate, this jointly negotiated procedure is not sufficient on its own to show a close nexus between the Union and the state. *See Driscoll v. Int'l Union of Operating Eng'rs, Local 139,* 484 F.2d 682, 690 (7th Cir. 1973) ("[G]overnmental regulation or participation in some of the affairs of unions does not consequently make every union activity so imbued with governmental action that it can be subjected to constitutional restraints."); *Hallinan,* 570 F.3d at 818. As Xiong has not identified any facts showing that the Union acted under the color of state law when it refused to arbitrate Xiong's grievance—such as evidence that the Union "acted as a state instrumentality, performed traditionally exclusive sovereign functions, or [was] compelled or even encouraged by the state" to refuse to arbitrate Xiong's claims, *Leahy v. Bd. of Trs. of Cmty. Coll. Dist. No. 508,* 912 F.3d 917, 921 (7th Cir. 1990)—Xiong's § 1983 claim against the Union must fail.

Xiong's § 1983 claims against the Department and Fischer fare no better. As a preliminary point, Xiong brought his § 1983 claims against Fischer in her "official capacity." Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Since an official capacity suit against Fischer would be redundant, given that the Department is a defendant as well, the district court gave Xiong the benefit of the doubt and construed the complaint as being against Fischer in her individual capacity. Based on the facts alleged here, we need not discuss the propriety of

the district court's decision in that regard because whether or not Xiong intended to bring his § 1983 claim against Fischer in her individual capacity does not impact our analysis.

Xiong alleges that Fischer and the Department violated his right to due process in failing to comply with § 18.13 of the Dane County Civil Service Ordinance. As previously discussed, this section relates to termination procedures. To state a claim for a due process violation, Xiong must first show that he was deprived of a protected property interest. *Wallace v. Tilley*, 41 F.3d 296, 299 (7th Cir. 1994). Once he has done so, the inquiry turns to whether the deprivation was constitutionally sufficient. *Id.* at 299. Here, neither the Department nor Fischer dispute that Xiong had a protected property interest in his employment with the Department, so we will focus only on whether Xiong received adequate due process during the termination proceedings.

Xiong argues that he did not receive adequate due process during the pre-termination proceedings with the Department. Specifically, he contends that he did not receive sufficient notice of the May 24 pre-disciplinary meeting because he only received written notice a few hours prior. We find this argument unpersuasive. A pre-termination proceeding is essentially "a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985), and an employer satisfies the requirements of due process if the employee receives: "(1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity to tell his side of

the story." *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 664 (7th Cir. 2009). The purpose of requiring notice of pre-termination proceedings is to permit the employee to gather his thoughts about the allegations against him and formulate a response. *See Staples v. City of Milwaukee*, 142 F.3d 383, 386 (7th Cir. 1998).

Here, the record indicates that Xiong was afforded an opportunity to review the charges against him and formulate a response. Fischer's May 22 letter to Xiong, which was sent to the Union as well, detailed numerous concerns about his job performance and several potential workplace violations, and informed him of the upcoming pre-disciplinary meeting on May 24. While Xiong did not receive this written notice until several hours before the pre-disciplinary meeting, he received oral notice of its contents on May 23 through Gravel, who spoke to Xiong by phone about the allegations surrounding his workplace conduct. Xiong also had an opportunity to meet with Gravel and his Union steward on May 24, prior to the pre-disciplinary meeting, in order to discuss the concerns articulated in Fischer's letter and formulate a response. Finally, Fischer again laid out her concerns about Xiong's work performance at the May 24 meeting and Xiong, who was given a chance to respond to the allegations, admitted to the conduct that led to his termination. Taken as a whole, these facts indicate that Xiong was afforded adequate due process throughout the pre-termination phase.

Xiong also argues that he did not receive adequate due process throughout the post-termination proceedings because Fischer and the Department bypassed steps 1 and 2 of the grievance process. However, both the record and the law prevent Xiong from succeeding on this claim. To begin with,

Xiong's claim against the Department is misplaced, as the CBA between the Union and the County places the onus to initiate and continue the grievance appeal procedure on the employee and the *Union*. The CBA imposes no duty on the Department to do anything until the employee or the Union make an oral request to begin the process at Step 1 and a written request to continue the appeal at Step 2. The record does not contain any evidence that the Department forced the Union to bypass steps 1 and 2 of the grievance process in Xiong's case, nor is there any evidence to support Xiong's assertion that the Union asked for steps 1 and 2. Rather, the evidence shows that the Union deliberately made a choice to bypass steps 1 and 2, believing that these measures would be counterproductive.

Furthermore, even if the evidence showed that the Union bypassed steps 1 and 2 of the grievance process at the Department's insistence, Xiong's due process claim would still fail. To begin with, failure to comply with state procedures does not automatically equate to a violation of Xiong's due process rights. *Mann v. Vogel*, 707 F.3d 872, 882 (7th Cir. 2013). While the requirements of due process vary with the particulars of the proceeding, it is well-established that the essential requirements of due process are notice and an opportunity to be heard. *Loudermill*, 470 U.S. at 542. In this case, Xiong was afforded a hearing in front of Travis Myren, the Dane County Chief Administrative Officer and Director of Administration, at which he was represented by the Union and given the opportunity to present his side of the story. Unlike Fischer and Green, who would have heard Xiong's grievance for a second time at steps 1 and 2, respectively, Myren had not played any role in the pre-termination proceedings, nor in the initial

decision to terminate Xiong. By proceeding directly to Step 3, therefore, Xiong gained the benefit of an impartial decision-maker in addition to being afforded a full hearing. Such process more than meets the demands of the Constitution. Moreover, Xiong's claim also fails because he cannot show that the Union breached its duty of fair representation. *See Vaca*, 386 U.S. at 186 (holding that a "wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual reme-dies" as long as the employee can "prove that the union breached its duty of fair representation in its handling of the employee's grievance"); *Mahnke*, 225 N.W.2d at 623.

Because Xiong has not provided any evidence from which a jury could conclude that his due process claim against the Department, nor any other due process argument that he raises, has merit, the decision of the district court is AFFIRMED.